UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————x

NIRVANA INTERNATIONAL, INC.,

        Plaintiff,

    -against-

ADT SECURITY SERVICES, INC.,

        Defendant.

—————————————————————x

No. 11 Civ. 8738 (CM)

### DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

McMahon, J.:

### INTRODUCTION

Plaintiff Nirvana International, Inc. ("Plaintiff") is a New York corporation with its principal place of business in New York. It hired Defendant ADT Security Services, Inc. ("Defendant") – a Delaware corporation with its principal place of business in Florida – to install an alarm system in Plaintiff's jewelry store. Defendant did, but the alarm didn't go off when burglars came, and Plaintiff was relieved of $2.4 million in merchandise.

Plaintiff sued for Defendant breach of contract and gross negligence, seeking the full value of its loss – and for forgery and fraud, seeking more limited damages.

Defendant moves to dismiss the complaint, on the ground that it owes Plaintiff at most $1000, relying on a contractual limitation of liability provision that it says was part of the contract between the parties. For the reasons discussed below, Defendant's motion is GRANTED.

1

## BACKGROUND

The relationship between Plaintiff and Defendant is governed by a contract. (See Rogan Aff. Ex. A (Complaint), Attach. ("Contract").)

The contract consists of three double-sided pages. Each sheet is numbered in the bottom left corner, as "1 of 6" through "6 of 6." To avoid confusion, I will refer to each page as [1 of 6], [2 of 6], and so on.

[1 of 6] is the front side of the first page; on its back is [6 of 6].

[2 of 6] is the front side of the second page; [5 of 6] is on its back.

[3 of 6] is on the front side of third and final page; [4 of 6] is on its back.

[1 of 6] sets forth the service and price terms and the signatures of Plaintiff's owner (Amit Sharma) and Defendant's sales representative. Above the signature line, the contract warns that "SECOND AND THIRD PAGES ACCOMPANY THIS PAGE WITH ADDITIONAL TERMS AND CONDITIONS."

[2 of 6] itemizes the service and equipment that Defendant agreed to provide.

[3 of 6] contains a bank authorization for billing signed by Sharma.

[4 of 6] (the back side of [3 of 6]) is titled "IMPORTANT TERMS AND CONDITIONS." [5 of 6] (the back side of [2 of 6]) and [6 of 6] (the back side of [1 of 6]) have the same title, followed by "(continued)."

Term "E," which appears on [6 of 6], is titled "LIMITATIONS ON LIABILITY." It provides, in relevant part, that:

> [DEFENDANT] IS NOT AN INSURER. THE AMOUNTS [DEFENDANT] CHARGES CUSTOMERS ARE NOT INSURANCE PREMIUMS. SUCH CHARGES ARE BASED ON THE VALUE OF THE SERVICES, SYSTEM AND EQUIPMENT ADT PROVIDES AND ARE UNRELATED TO THE VALUE OF CUSTOMER'S PROPERTY.

2

Term E goes to explain the possibility that Defendant's system will sometimes fail to detect the occurrences it is designed to guard against, but says that Defendant does not undertake any of that risk.  Rather, the customer is required to obtain insurance to cover the value of its property, and required to waive any right it might otherwise have against Defendant.  It then says that:

> IF NOTWITHSTANDING THE PROVISIONS OF THIS SECTION E, DEFENDANT] IS FOUND LIABLE FOR LOSS, DAMAGE OR LIABILITY UNDER ANY LEGAL THEORY DUE TO THE FAILURE OF ITS SERVICES, SYSTEM OR EQUIPMENT IN ANY RESPECT, ITS LIABILITY SHALL BE LIMITED TO A SUM EQUAL TO 10% OF THE ANNUAL SERVICE CHARGE OR $1000, WHICHEVER IS GREATER . . . .

The parties agree that, if term E is part of their contract, it limits Defendant's liability – under any and all theories – to $1000.  As discussed below, the dispute on this motion is whether the terms and conditions contained on [4 of 6], [5 of 6], and [6 of 6] are part of the parties' agreement.

At the bottom of [6 of 6] there is a signature and date line, under the words "Customer Acceptance."  Beneath that, in a boxed off area, the following language appears:

> BY CUSTOMER INITIALING IN THE SPACE PROVIDED BELOW, CUSTOMER ACKNOWLEDGES AND ADMITS THAT CUSTOMER HAS READ THE IMPORTANT TERMS AND CONDITIONS SET FORTH ON PAGES 4 THROUGH 6, INCLUSIVE, OF THIS AGREEMENT AND UNDERSTANDS AND AGREES TO ALL SUCH TERMS AND CONDITIONS.

Beneath this language, space is provided for the initials of the customer, Defendant's sales representative, and Defendant's manager. (Contract.)

On May 17, 2010, Sharma sat down with Defendant's sales representative to execute the contract.  Sharma read, understood, and agreed to pages [1 of 6], [2 of 6] and [3 of 6] by signing and initialing each of them.  However, Sharma told Defendant's representative he could not agree to the terms and conditions on [4 of 6] through [6 of 6] until he reviewed them more carefully.

3

Defendant's representative left without obtaining initial or a signature on pages [4 of 6], [5 of 6] or [6 of 6]. (Complaint ¶¶ 38-40.)

Sharma later decided that the terms and conditions on [4 of 6] through [6 of 6] were not acceptable to him. However, Sharma did not communicate his point of view to Defendant. (Id. ¶¶ 41, 42.)

On June 8, 2010, Defendant installed its alarm system, even though Sharma had not initialed the terms and conditions or signed page [6 of 6]. Sharma permitted Defendant to install the alarm, without alerting Defendant that he objected to any of the terms and conditions. Thereafter, Plaintiff paid the monthly monitoring fee of $44. (Id. ¶ 31.)

On December 4, 2010, at approximately 8:00pm, Sharma closed the jewelry store for the night and armed the alarm system. Sharma did not return to the store until 11:00 am the following day. When he did, he noticed that the lock to the building has been glued shut. (Id. ¶ 49.)

Sharma called the property manager, who told him to call a locksmith. At 3:30pm the locksmith arrived and unlocked the door.

Concerned about a possible burglary, Sharma called the police, who arrived at approximately 3:45pm. After Sharma, the property manager, and the police entered the store, they saw that a hole had been cut in the ceiling to the office, from which a ladder remained hanging. The door to the safe had been completely sawed off – a process the police officer speculated must have taken at least 45 minutes. The safe was empty. (Id. ¶¶ 52, 54, 56.)

Sharma reviewed video footage taken from cameras that were installed in the store (cameras that were not part of Defendant's security system, but had been previously installed by Sharma). (Id. ¶ 58.) The video shows that, at 11:10pm on December 4, a flashlight was flashed

4

on the sensor Defendant installed.  The burglars apparently wanted to see if the alarm had alerted

the police, because it was not until 11:40pm that the video shows one of the burglars lowering

his head down into the camera frame.  Shortly thereafter, the video shows one of the burglars

pulling the cable out of the video recorder, after which the video shuts off. (Id.)

The burglary resulted in the theft of 150 pieces of jewelry and loose stones, valued at

approximately $2.4 million.

When Sharma notified Defendant of the burglary, Defendant disclaimed liability for

losses of more than $1000, relying on the limitation of liability contained on sheet [6 of 6] of the

contract.  Defendant produced a "central storage" copy of the contract that showed Sharma's

signature on page [6 of 6].  Plaintiff alleges that Sharma never signed [6 of 6], and that the

signature on Defendant's copy was a forgery (id. ¶ 86), and I assume the truth of this allegation.

Plaintiff retained a hand-writing expert, who opined that Sharma most likely did not write

the signature on Defendant's copy of the contract. (Id. ¶¶ 91-94.)  The Complaint does not

specify how much Plaintiff spent to uncover the alleged forgery.

On December 5, 2011, Plaintiff sued Defendant for breach of contract, negligence, and

gross negligence, seeking the full extent of its $2.4 million loss, and for forgery/fraud, seeking to

recoup the expenses of retaining the handwriting expert to prove the forgery.  After Defendant

filed an earlier motion to dismiss, Plaintiff amended its complaint.  Defendant has since re-filed

its motion.

## ANALYSIS

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint

for "failure to state a claim upon which relief can be granted."  "To survive a motion to dismiss

under Rule 12(b)(6) . . . a complaint must contain sufficient factual matter accepted as true, to

state a claim to relief that is plausible on its face." Mabry v. Neighborhood Defender Serv., 769

F. Supp. 2d 381, 389 (S.D.N.Y. 2011) (citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)).

"A plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation

of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

(2007).

　　　To determine if a motion to dismiss for failure to state a claim is appropriate, the Court

must "accept as true all facts alleged in the complaint" and "draw all reasonable inferences in

favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

When considering a motion to dismiss, "The appropriate inquiry is not whether a plaintiff is

likely to prevail, but whether he is entitled to offer evidence to support his claims." Id. (quoting

Fernandez v. Chertoff, 471 F.3d 45, 52 (2d Cir. 2006)).  Although for the purposes of a motion to

dismiss, the Court must "take all of the factual allegations in the complaint as true," the Court is

"not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct.

at 1950.

　　　In addition to the complaint, a court deciding a Rule 12(b)(6) motion may also consider

documents the plaintiff attaches to the complaint. See Rothman v. Gregor, 220 F.3d 81, 88-89

(2d Cir. 2000).  Here, Plaintiff has attached the contract between it and Defendant to its

Complaint, and the Court will consider it as part of the operative pleading.


A. *Breach of contract (Count I)*

　　　I assume for purposes of the motion that Sharma's signature on [6 of 6] was forged.

Nevertheless, Plaintiff is bound by the limitation of liability provision.

6

Plaintiff was given the entire six-page contract, consisting of three-page double-sided pages. The document states, above the signature line on the first page, that it includes "SECOND AND THIRD PAGES WITH ADDITIONAL TERMS AND CONDITIONS." Insofar as each "page" had two-sides, and thus included each of the six sheets, this language clearly incorporates the "IMPORTANT TERMS AND CONDITIONS" included on what I have been calling [4 of 6] through [6 of 6]. Moreover, each sheet indicated that it was "n of 6" sheets. Plaintiff does not deny that he read all six sheets and understood their terms.

"It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 403 (2d Cir. 2004). The rule is given in the Second Restatement of Contracts as follows: "(1) Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance . . . (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation." Restatement (Second) of Contracts § 69 (1981). A comment explains that "The resulting duty is not merely a duty to pay fair value, but a duty to . . . perform according to the terms of the offer." Id. cmt. b.

Applying this "standard contract doctrine" here, Plaintiff admits that: (1) Sharma knew about all of the terms and conditions of the contract, including the limitation on liability; (2) he never expressly communicated to Defendant his rejection of any of the terms, despite having an opportunity to do so; and (3) he accepted the benefits of Defendant's performance by allowing Defendant to install the alarm system. Sharma told Defendant's representative that he needed to read the provisions before he could agree to them; however, he never told any representative of

7

Defendant that he would not agree to any of the terms. Instead, he allowed Defendant to install

the system, accepted its benefits (such as they were) and paid the agreed upon-price. Thus, he is

bound by all of the conditions of Defendant's offer, including the terms and conditions set forth

on page [6 of 6].

Plaintiff argues that Sharma's failure to sign and initial sheet [6 of 6] in the marked

spaces somehow makes sheets [4 of 6] through [6 of 6] not part of the parties' agreement. But

Plaintiff is wrong as a matter of law. Defendant's offer was conditioned on Plaintiff's accepting

the terms and conditions contained on pages [4 of 6] through [6 of 6]. Sharma neither expressly

*accepted* nor expressly *rejected* the terms and conditions contained on those pages; rather, he

said he needed to consider them more carefully. (Complaint ¶ 39.) But Sharma knew of their

existence, and the law construes his silence, combined with his acceptance of the benefits of

Defendant's performance, as an implicit acceptance. Thus, the failure to sign page six does not

assist Plaintiff.

The case of National City Golf Finance v. Higher Ground Country Club Management

Co., LLC, 641 F. Supp. 2d 196 (S.D.N.Y. 2009), is analogous. There, the issue was whether the

parties agreed to arbitrate disputes arising out of a series of contracts. The contested arbitration

provision was in a document termed the "Service Agreement," the fourth of four separate

documents submitted to Higher Ground to be signed. Higher Ground alleged that it never signed

the Service Agreement, and argued that it was therefore not bound by its terms, including the

arbitration provision.

Then-District Judge Lynch rejected this argument, relying on the doctrine discussed

above. Higher Ground had accepted the benefits of the Service Agreement by requesting and

8

receiving service, without communicating its rejection of any of the Service Agreement's terms;

it was therefore bound by the entire Agreement.

> Whether or not the Service Agreement was ever signed by Higher Ground, Higher
> Ground's conduct manifested an intent to adopt or agree to the unsigned
> Agreement, including the arbitration clause. ProLink correctly maintains that the
> conduct of Higher Ground in requesting service, parts and repairs manifested a
> meeting of the minds sufficient to constitute a contract. ProLink in turn relied on
> the Service Agreement in installing and servicing the GPS units and training
> Higher Ground's employees.

> Higher Ground accepted the benefit of the bargain (however dubious it now finds
> those benefits to have been) and, in so doing, ratified the contract by its actions.

Id. at 207 (internal quotation marks and citations omitted).

In another arbitration case, Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9

F.3d 1060 (2d Cir. 1993) – relied on by Judge Lynch in National City Golf – the Second Circuit

held that Noraudit – a party seeking to avoid an arbitration provision in an agreement it did not

sign – was bound by the provision, because, as here, Noraudit "failed to object to the Agreement

when it received it and offers no persuasive reason for its inaction." Id. at 1064. Moreover,

Noraudit "knowingly accepted the benefits of the Agreement." Thus, it was bound by all the

terms of the Agreement of which it had notice, and to which it failed to object, when it silently

accepted the benefits of performance.

Likewise here: Sharma knowingly accepted the installation of the alarm system and the

ongoing provision of services from June through December 2010. Under the rule stated in

Restatement (Second) § 69, and the cases cited above, Sharma is bound by all of the provisions

of the contract, including the limitation on liability on page [6 of 6].

The Court recognizes that this result may appear strange in light of Defendant's behavior,

particularly its effort to forge what turned out to be a legally superfluous signature. However,

Defendant's ignorance of the law (and its alleged chicanery) does not alter the operation of the

9

fundamental contract doctrine implicated in this case.  The presence of an unnecessary signature line on page [6 of 6] is no more controlling than the (effectively) superfluous signature lines in National City Golf, Deloitte, or any other case that arises under Restatement § 69, where acceptance is implied by silence rather than express.  Sharma communicated an implicit acceptance of the whole contract when he failed to notify Defendant that he was unwilling to agree to the limitation of liability, while at the same time allowing Defendant to install the alarm system.  Among the terms he thereby accepted was that in no event would Defendant's liability exceed $1000.

B. *Negligence and Gross Negligence (Counts II and III)*

In general, there is no tort liability for a breach of contract unless an independent legal duty has been violated, and an "alarm company can only be held liable in tort for its gross failure to perform its contractual services in the rare cases where . . . a public interest is implicated." Vigilant Ins. Co. v. ADT Sec. Services, Inc., 2011 WL 855874, *3 (S.D.N.Y. Mar. 9, 2011). Here, Defendant owed no independent legal duty to install an alarm system in Plaintiff's store, and the public interest is not implicated.  Thus, Plaintiff's negligence and gross negligence claims must be dismissed.

Even if it were not dismissed, Defendant's liability would be limited to $1000 under the contractual limitation of liability provision, which applies to any and all liability between the parties.

10

C. *Forgery/Fraud (Count IV)*

The final issue is whether Plaintiff can recover damages in the amount of the cost in incurred to retain a hand-writing expert to prove that the signature on sheet [6 of 6] of Defendant's copy of the contract was a forgery.

It appears to be well established that there is no cause of action for forgery under New York law. See Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002). The question then becomes whether the forgery in this case can serve as a predicate "misrepresentation" in a fraud cause of action.

The elements of common law fraud are (1) a misrepresentation of material fact, (2) made with fraudulent intent, (3) upon which the plaintiff reasonably relies to his (4) economic detriment. See, e.g., Harborview Value Masterfund, L.P. v. Freeline Sports, Inc., 2012 WL 612358, at *6 (S.D.N.Y. Feb. 23, 2012) (citing Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413 (1996)). Plaintiff did not rely on his forged signature so Plaintiff has no claim for fraud.

"Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it." Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007) aff'd, 354 F. App'x 496 (2d Cir. 2009). Here, Plaintiff never "fell for" the misrepresentation; rather, Sharma identified the signature as a forgery from the outset. Plaintiff did not hire the hand-writing expert in reliance on the veracity of the signature – i.e., the implicit representation that the signature was made by Sharma. Instead, Plaintiff hired to expert because it refused to rely on the "false" signature. Given

11

Plaintiff's failure to plead reliance on the "misrepresentation," Plaintiff cannot state a claim for fraud.[1]

## CONCLUSION

Defendant's motion is granted and the complaint is dismissed.  Plaintiff is free to seek its $1000 from Defendant in State court, where the jurisdictional deficiencies herein identified are no barrier to recovery.

The clerk of Court is directed to close the open motion at ECF No. 13 and terminate the case from the Court's docket.

Dated:  July 31, 2012

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

---

[1]     Even if the Court were to accept Plaintiff's position, Plaintiff cannot meet the amount in controversy requirement for diversity jurisdiction on its fraud claim, unless the handwriting expert cost Plaintiff $74,001.